# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS and ONSTAR, LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>DEALERS WARRANTY, LLC d/b/a "FEDERAL AUTO PROTECTION", NATIONAL DEALERS WARRANTY, INC. d/b/a "NATIONAL DEALERS WARRANTY," TELE EUROPE B.V., DEALERS PREFERRED WARRANTIES, LLC, TELEPHONE MANAGEMENT CORPORATION, TM CALLER ID, LLC, VOICE TOUCH, INC., TRANSCONTINENTAL WARRANTY, INC., DEALER WARRANTY SERVICES, LLC, DIRECT PROTECT WARRANTY, d/b/a "WARRANTY SERVICES," JOHN DOE No. 1 (a/k/a owner, user or "spoofer" of telephone numbers 949-256-9145, 909-650-9178, 909-650-9173, 909-650-9154, 616-980-2584, 402-982-0477, 402-982-0524, 775-337-6175, 202-610-3068, 818-870-9251, 989-637-1044, 773-728-8019, 603-214-3674, 818-870-5070, 402-982-0582, 978-570-2308, 909-650-9103, 760-526-8562, 909-650-9101, 909-842-9188, 205-561-2815, 208-664-0749, 213-710-8113, 269-768-2199, 303-749-9642, 310-485-8905, 402-982-0602, 509-935-0671, 603-214-3340, 603-214-3658, 626-273-8207, 636-688-5522, 773-321-2949, 949-256-9116, 949-256-9145, 978-570-2249, 561-784-9844 and 305-836-7371) and JOHN DOES 2-50,<br><br>     Defendants. | Civil Action No. 3:09-cv-1814 (FLW) (DEA)<br><br>*Document Electronically Filed* |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED AND GRANTING EXPEDITED DISCOVERY AND RELATED RELIEF**

Philip R. Sellinger (PS-9369)
Ian S. Marx (IM-1704)
**GREENBERG TRAURIG, LLP**
200 Park Avenue; P.O. Box 677
Florham Park, New Jersey  07932-0677
(973) 360-7900 (Phone)
(973) 301-8410 (Facsimile)

Attorneys for Plaintiff
*Cellco Partnership d/b/a Verizon Wireless*

-and-

Timothy A. Daniels
Figari & Davenport, LLP
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
(214) 939-2016 (Phone)

Stephen F. Payerle
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711 (Phone)

Attorneys for Plaintiff
*OnStar, LLC*

1

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ......................................................................................2

A.    The Parties .................................................................................................2

B.    The Telemarketing Calls..........................................................................4

C.    The Defendants are Responsible for these Calls...................................7

D.    The Telemarketing Calls Are Done Through an Autodialer .................11

E.    The Harm To Verizon Wireless...............................................................12

ARGUMENT ........................................................................................................14

      THE COURT SHOULD ENTER THE PROPOSED ORDER
      TO SHOW CAUSE AND A PRELIMINARY INJUNCTION.........................14

A.    Verizon Wireless Is Entitled to an Injunction Pursuant to Statutory Authority ...............14

1.    Defendants Clearly Have Violated the TCPA .........................................15

2.    Defendants Clearly Have Violated the TCFAPA .....................................17

3.    Reasonable Likelihood of Future Violations ............................................19

B.    Verizon Wireless also is Entitled to an Injunction Pursuant to Federal Rule of Civil
      Procedure 65 .............................................................................................20

1.    Likelihood of Success on the Merits.........................................................21
      a.    TCPA ...............................................................................................21
      b.    Violation of TCFAPA......................................................................21
      c.    NJ CFA ...........................................................................................22
      d.    Invasion of Privacy ........................................................................23

2.    Irreparable Injury .......................................................................................24

3.    Balance of Harms and the Public Interest................................................25

C.    Expedited Discovery .................................................................................26

CONCLUSION......................................................................................................27

i

TABLE OF AUTHORITIES

Federal Cases      Page(s)Cases

*Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)    15

*Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100 (3d Cir. 1988)    20, 21

*Government of V.I. v. Virgin Islands Paving, Inc.*, 714 F.2d 283, 286 (3d Cir. 1983)    14

*In re Bradshaw*, 233 B.R. 315, 326 (D.N.J. 1999)    14, 15, 20

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803 (3d Cir. 1989)    15

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586 (3d Cir. 2002)    20

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)    24

*TKR Cable Co. v. Cable City Corp.*, 1996 WL 465508 (D.N.J. 1996)    26

*Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995), *cert. denied*, 516 U.S. 1145 (1996)    26

*U.S. v. Toys "R" Us, Inc.*, 754 F.Supp. 1050 (D.N.J. 1991)    14, 15

*United States Postal Service v. Beamish*, 466 F.2d 804, 806 (3d Cir. 1972)    14

*United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976)    14

State Cases
*Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 94-95 (1992) .......................................... 23

*J.H. Renarde, Inc. v. Sims*, 312 N.J.Super. 195, 203 (Ch. Div. 1998) ........................................... 25

*Jersey City Ass'n for Separation of Church and State v. Jersey City*, 34 N.J. 177, 178 (1961) ... 26

*Kaplan v. Democrat and Chronicle*, 698 N.Y.S.2d 799, 800 (N.Y. App. Div. 1999) ................. 16

*Kinsella v. Welch*, 362 N.J. Super. 143, 156 (App. Div. 2003) ...................................................... 23

*Schulman v. Chase Manhattan Bank*, 268 A.D.2d 174, 175-176 (N.Y. App. Div. 2000) ..... 16, 21

*Sunbeam Corp. v. Windsor 5th Avenue*, 14 N.J. 222, 233 (1953) ........................................... 24, 25

*Szefczek v. Hillsborough Beacon*, 286 N.J. Super. 247, 266-68 (Law Div. 1995) ................. 16, 21

Federal Statutes
15 U.S.C. § 6104(a) .......................................................................................................... 14, 22

15 U.S.C. §6101 ............................................................................................................... 17
47 U.S.C. § 227 ......................................................................................................... 14, 15
47 U.S.C. § 227(a)(1) ...................................................................................................... 17
47 U.S.C. § 227(b)(3) ..................................................................................................... 16

State Statutes
N.J.S.A. 56:8-130 ...................................................................................................... 22, 23
N.J.S.A. 56:8-130(b) ....................................................................................................... 22


Federal Regulations

16 C.F.R. § 310.4(a)(7) ................................................................................................ 9, 11

## PRELIMINARY STATEMENT

Plaintiffs Verizon Wireless and OnStar, LLC (together "Plaintiffs") bring this motion to bring an immediate halt to a massive illegal telemarketing campaign by certain of the Defendants.  Since October 2008, Defendants or those acting on their behalf made over **eight million** unsolicited telemarketing calls to Verizon Wireless subscribers, through the apparent use of an autodialing mechanism and a prerecorded message, offering to sell an extended auto warranty – conduct that is expressly prohibited by the federal Telephone Consumer Protection Act ("TCPA"), the Telemarketing and Consumer Fraud and Abuse Protection Act ("TCFAPA") and the FTC's telemarketing regulations and state consumer fraud and privacy law.

Verizon Wireless first brought this action and request for preliminary injunction in April 2009 against Dealers Warranty, LLC d/b/a "Federal Auto Protection" and National Dealers Warranty, Inc. d/b/a "National Dealers Warranty" and against Tele Europe B.V.  The Court entered permanent injunctions on consent and a preliminary injunction by default against Tele Europe B.V.

Verizon Wireless has since been able to identify several additional entities that have been involved in this massive illegal auto warranty telemarketing effort, and which have continued making calls even after this action was brought.  Accordingly, Verizon Wireless has filed an amended complaint naming as defendants Dealers Preferred Warranties, LLC, Telephone Management Corporation, TM Caller ID, LLC, Voice Touch, Inc., Transcontinental Warranty, Inc., Dealer Warranty Services and Direct Protect Warranty, d/b/a "Warranty Services." Additionally, OnStar, which provides telematics services to automobile customers throughout the United States over the Verizon Wireless network, and whose customers have also received hundreds of thousands of these illegal telemarketing calls, has joined with Verizon Wireless as a plaintiff to stop these calls.

Through the current application, Verizon Wireless and OnStar seek to preserve the privacy of their subscribers through entry of an injunction prohibiting the foregoing Defendants' illegal conduct and an award of statutory and common law damages.  The TCPA and the TCFAPA expressly provide for the entry of preliminary injunctive relief, which, for the reasons set forth herein, should be granted.

## STATEMENT OF FACTS[1]

A.   **The Parties**

    1.    **The Plaintiffs**

        a.    **Verizon Wireless**

Verizon Wireless is a leading provider of wireless communications with more than 80 million customers throughout New Jersey and the United States.  Many of Verizon Wireless' employees receive wireless telephone service through "concession accounts," which are wireless phone lines that Verizon Wireless maintains for its own or its employees' use.  *See* First Amended Ver. Compl. ¶ 7.

---

[1] The facts in support of this application are set forth in the accompanying Verified First Amended Complaint, sworn to on June 12, 2009 (the "First Amended Ver. Compl."), by James Rogers of Verizon Wireless and Steven Paul Schwinke of OnStar, LLC.

### b.   OnStar

OnStar provides services to telematic equipment installed in millions of vehicles in the United States.  The OnStar system utilizes wireless communications to provide to its subscribers, among other things, a connection to emergency assistance and access to OnStar hands-free calling.  OnStar utilizes the Verizon Wireless network to provide these services.  *See* First Amended Ver. Compl. ¶ 9.

### 2.   The Defendants

The Defendants in this action fall into three categories, including (a) the "Caller Defendants," (b) the "Advertiser Defendants," and (c) the "Facilitator Defendants."  Entities from each of the three categories of Defendants act in concert with one another to originate the Telemarketing Calls and to use various methods to either conceal or fail to disclose information to consumers who are the recipients of Telemarketing Calls in the advertisement of services purportedly offered by the Advertiser Defendants.

### c.   The "Caller Defendants"

The Caller Defendants physically place calls to consumers on behalf of the Advertiser Defendants using automatic telephone dialing systems and recorded voice messages.  The "Caller Defendants" include Voice Touch, Inc. and Tele Europe B.V., as well as other yet unknown entities.  If a customer expresses interest in response to an automated call, the customer is connected to a representative of the Advertiser Defendants.  Additionally, the Caller Defendants, in some cases acting in concert with the Facilitator Defendants, employ methods of concealing or disguising the telephone numbers from which the calls are being placed and/or the Caller Defendants' and the Advertiser Defendants' identities so that neither the telephone

number nor the identity of the caller appears on a consumer's caller ID.  All of these practices are prohibited by the TCPA and the TCFAPA.

### d.    The "Advertiser Defendants"

The "Advertiser Defendants" include Transcontinental Warranty, Inc., Dealer Warranty Services, Inc., Direct Protect Warranty, Inc., Dealers Preferred Warranties, LLC, Dealers Warranty, LLC and National Dealers Warranty, Inc.  The Advertiser Defendants employ the Caller Defendants to make Telemarketing Calls on their behalf, in an effort to sell automobile warranties to recipients of the Telemarketing Calls.

### e.    The "Facilitator Defendants"

The Facilitator Defendants include Telephone Management Corporation and TM Caller ID, LLC (also referred to herein together as "TMC").  The Facilitator Defendants enable the Caller Defendants to make Telemarketing Calls by providing them with numerous telephone numbers that the Caller Defendants can have appear as the caller ID when a customer receives a Telemarketing Call. The Caller Defendants use these caller ID's – and the ability to change these caller ID's on an almost daily basis – to obscure the identity of the callers as well as the identities of the parties on whose behalf the Telemarketing Calls are being made, in direct contravention of the FTC's telemarketing rules.

## B.    The Telemarketing Calls

Since September 2008, thousands of Verizon Wireless customers and employees have received calls on their wireless telephones consisting of a prerecorded voice message indicating that their car warranty is about to expire or has expired and urging the recipient to press "1" to speak to a representative.   When a recipient presses "1", he or she is connected to a person who asks for the make and model of their car in an effort to sell them an extended warranty. *See* First

Amended Ver. Compl. ¶ 24.  These calls have each been placed by one of the Caller Defendants on behalf of the Advertiser Defendants.  If the recipient of the call presses "1," he or she is then connected to a representative who is employed by the Advertiser Defendants.  *See* First Amended Ver. Compl. ¶ 25.

The Caller Defendants and/or the Advertiser Defendants take measures to obscure their identities from the recipients of the calls.  The Caller Defendants generally use one of two methods to hide themselves.  Some Caller Defendants, including upon information and belief, defendant Voice Touch, "spoof" the Caller ID for these calls, which means that a false telephone number and, in some cases, other identifying information, is provided on the recipient's caller ID when the call is received.  In reality, these numbers are either unassigned, non-working numbers, or may even in some cases belong to unsuspecting third parties. The recipients of spoofed calls are unable to determine from the information shown on the caller ID either the identity of the entity from which they receive the call or the telephone number from which the call is placed.  *See* First Amended Ver. Compl. ¶ 27.

In other cases, Caller Defendants cause one of many caller IDs that is assigned to them by the Facilitator Defendants to appear when making these calls.  The Facilitator Defendants obtain caller ID's from non-party telecommunications service provides such as BayRing Communications, Freedom Ring Communications, LLC, Citistream Communications, Inc. and Digitcom Services.  The Facilitator Defendants may obtain and assign to a Caller Defendant dozens if not hundreds of caller ID's to pick from when initiating calls.  *See* First Amended Ver. Compl. ¶ 28.

The Caller Defendants constantly rotate the caller ID that they cause to appearing when making calls on an almost daily basis for the purpose of concealing the identities of those who

are making the Telemarketing Calls and the identities of the entities on whose behalf the calls are being made. In these cases, when Verizon Wireless customers and employees have attempted to call back these numbers, they have received an automated message indicating that they received a call from this number "in error" and directing them to press "1" to be removed from the list. *See* First Amended Ver. Compl. ¶ 29.

The Facilitator Defendants are aware of the fact that the Caller Defendants use the large number of caller ID's that the Facilitator Defendants provide to them in an effort to avoid detection of their illegal telemarketing practices. *See* First Amended Ver. Compl. ¶ 30. Defendant TMC has been made aware of the Caller Defendants' conduct by having received numerous complaints that its customers, including the Caller Defendants have been engaged in a substantial number of illegal Telemarketing Calls. *See* First Amended Ver. Compl. ¶ 31. On several occasions, Verizon Wireless has requested through formal and informal means that Defendant TMC provide cooperation and assistance to Verizon Wireless in connection with efforts to make the Telemarketing Calls cease, but TMC was unwilling to provide such cooperation and assistances and, in fact, has withheld information. *Id.* To the contrary, TMC continues to supply hundreds of caller IDs to the Caller Defendants that are instrumental to their scheme to place the Telemarketing Calls. *Id.* There is no legitimate business purpose in which any of the Caller Defendants could be engaged that would require the purchase of such a large quantity of caller IDs sold to them by TMC. *Id.*

The Advertiser Defendants also take steps to conceal their identity and role in this illegal scheme. When the recipient of a Telemarketing Call presses "1" and asks at the outset of the call for the name of the company that is offering the warranty, the representative on the line often refuses to provide information regarding either the company making the call or on whose behalf

the call was place or provides only vague information that fails to identify the name of the entity or entities responsible for the call. *See* First Amended Ver. Compl. ¶ 32.

**C.     The Defendants are Responsible for these Calls**

Despite the Defendants' efforts to conceal their identities, Plaintiffs have been able to develop evidence that the Caller Defendants, Advertiser Defendants and Facilitator Defendants, and perhaps others that are still unidentified, but that may be working in concert with the Caller Defendants, Advertiser Defendants and Facilitator Defendants, are responsible for the Telemarketing Calls.

On March 11, 2009, a Verizon Wireless employee received a call that appeared to be from 909-650-9178 with an automated message seeking to sell her an auto warranty. After the customer pressed "1" in response to the message, she spoke to a representative named "Carl" and expressed interest in purchasing a warranty and provided some information about a make and model of a car. When the Verizon Wireless employee asked "Carl" what company he was associated with, "Carl" then responded that he was with "Federal Auto Protection." *See* First Amended Ver. Compl. ¶ 33. The caller ID (909) 650-9178 was assigned by Digitcom (a small telecommunications carrier) to one of the Facilitator Defendants, which in turn assigned this number to (an as yet unidentified) Caller Defendant for purposes of placing the call. *See* First Amended Ver. Compl. ¶ 34.

On March 18, 2009, another Verizon Wireless employee received a call that appeared to be from (949) 256-9145 with an automated message seeking to sell him an auto warranty. After the employee pressed "1" in response to the message, he spoke initially with two representatives and was eventually transferred to a representative named "Patty." When the employee asked "Patty" what company she was with, "Patty" was evasive and did not provide an answer. The employee then expressed interest in purchasing a warranty and provided some information about

a make and model of a car but indicated he needed to go to another appointment and wanted to continue the conversation later. "Patty" told the employee that he could call her back at (800) 774-0041.   Later that day, the employee called that number and spoke to Patty again.   Upon information and belief, the number (800) 774-0041 is assigned by Qwest Communications to defendant National Dealers Warranty. *See* First Amended Ver. Compl. ¶ 35. The caller ID (949) 256-9145 was assigned by Digitcom (a small telecommunications carrier) to one of the Facilitator Defendants, which in turn assigned this number to (an as yet unidentified) Caller Defendant for purposes of placing the call. *See* First Amended Ver. Compl. ¶ 36.

On March 19, 2009, the same Verizon Wireless employee received two further calls from "Patty" following up on his interest in purchasing the auto warranty.   The number that appeared on the caller ID for these calls was (800) 436-3185.   According to defendant National Dealers Warranty's website, www.ndwwarranty.com, (800) 436-3185 is the toll-free customer service number for defendant National Dealers Warranty. *See* First Amended Ver. Compl. ¶ 37.

On March 25, 2009, another Verizon Wireless employee received a call that appeared to be from (402) 982-0524 with an automated message seeking to sell him an auto warranty.   After the employee pressed "1" in response to the message, he spoke to a representative named "Jeremy" and expressed interest in purchasing a warranty and provided some information about a make and model of a car.   When the Verizon Wireless employee asked "Jeremy" what company he was associated with, "Jeremy" responded that he was with "Federal Auto Protection." *See* First Amended Ver. Compl. ¶ 38.  The caller ID (402) 982-0524 was assigned by Citistream Communications, Inc. (a small telecommunications carrier) to one of the Facilitator Defendants, which in turn assigned this number to (an as yet unidentified) Caller Defendant for purposes of placing the call. *See* First Amended Ver. Compl. ¶ 39.

On May 6, 2009, another Verizon Wireless employee received a call that appeared to be from (775) 337-6175, with an automated message seeking to sell him an auto warranty. After the employee followed prompts in the automated message, he spoke to a representative named "Jessica" and expressed interest in purchasing a warranty. When the Verizon Wireless employee asked "Jessica" what company she was associated with, "Jessica" responded that she was with Warranty Solutions. The Verizon Wireless employee was then transferred to a representative named "Dave," to whom the Verizon Wireless employee again expressed interest in purchasing a warranty, and provided some information regarding a make and model of a car. When the Verizon Wireless employee asked "Dave" what company he was associated with, "Dave" responded that he was with "Dealer Preferred Warranties," and that his direct dial phone number is (866) 364-3331. According to defendant Dealer Preferred Warranties' website, www.dpwarranties.com, (866) 364-3331 is the toll-free customer service number for defendant Dealer Preferred Warranties. *See* First Amended Ver. Compl. ¶ 40. The caller ID (775) 337-6175 was not assigned to a working number and had been "spoofed" by the Caller Defendant that placed this call. *See* First Amended Ver. Compl. ¶ 41.

On May 20, 2009, another Verizon Wireless employee received a call that appeared to be from (408) 651-8136 with an automated message seeking to sell him an auto warranty. After the employee pressed "1" in response to the message, he spoke to a representative and expressed interest in purchasing a warranty and provided some information about a make and model of a car. When the Verizon Wireless employee asked the representative what company he was associated with, the representative responded that he was with Dealer Warranty Services and that his call back number is (800) 581-1575. According to defendant Dealer Warranty Services'

website, www.dws-us.biz, (800) 581-1575 is defendant Dealer Warranty Services' toll-free number. *See* First Amended Ver. Compl. ¶ 42.

On March 23, 2009, a Verizon Wireless employee received a call that appeared to be from (202) 610-3068 with an automated message seeking to sell her a warranty. After the employee pressed "1" in response to the message, she spoke to a representative who purported to be affiliated with an entity called "Warranty Services." The Verizon Wireless employee identified herself by an alias, "Jane Sullivan," and expressed interest in purchasing a warranty from "Warranty Services," but asked stated that she needed time to consider the issue and asked for a call back number. The representative instead offered to call the employee back. On May 19, 2009, the Verizon Wireless employee received a follow-up call on the same phone line from a representative asking for "Jane Sullivan," and, after the employee again expressed interest in purchasing a warranty, she was connected to another representative who, after extensive prodding, identified himself as being with defendant Direct Protect Warranty. *See* First Amended Ver. Compl. ¶ 43.

On March 18, 2009, another Verizon Wireless employee received a call that appeared to be from (616) 980-2584, with an automated message seeking to sell him a warranty. After the employee pressed "1" in response to the message, he spoke to a representative who refused to provide a call back number and identified the company offering the warranty only as the "warranty help desk." Upon information and belief, the number (616) 980-2584 was assigned by Citistream Communications, Inc. (a small telecommunications carrier) to Caller Defendant Tele-Europe, B.V, which was responsible for making this call. *See* First Amended Ver. Compl. ¶ 44.

Numerous Verizon Wireless customers and employees have received telemarketing calls from 561-784-9844 and 305-836-7371. Upon information and belief, these calls were made by

Caller Defendant Voice Touch on behalf of Transcontinental.[2]  *See* First Amended Ver. Compl. ¶ 45.

**D.    The Telemarketing Calls Are Done Through an Autodialer**

Since late February 2009 alone, the Caller Defendants, the Advertiser Defendants, or others acting on their behalf, have, with the assistance of the Facilitator Defendants, made over 8,091,335 calls to Verizon Wireless customers and/or concession accounts, of which approximately 15,671 were made to Verizon Wireless concession accounts.  *See* First Amended Ver. Compl. ¶¶ 46-47.  The volume of calls placed from a single telephone number during very short time spans demonstrates that they were made by using automatic telephone dialing system equipment that has the capacity to store or produce telephone numbers to be called using a random or sequential number generator.  Verizon Wireless has been able to document dozens of instances in which between tens of thousands and several hundred thousand calls were placed from a single caller ID in the course of a period of a few days.  For instance, on March 13, 2009, approximately 25,911 calls were made between 1:00 p.m. and 2:00 p.m. with a caller ID of 949-256-9145, or on average one call every approximately .13 seconds.  *See* First Amended Ver. Compl. ¶ 49.  In another instance, approximately 30,793 calls were made between 2:00 p.m. and 3:00 p.m. alone with a caller ID of (818) 870-9251, or on average one call every approximately .12 seconds.  *See* First Amended Ver. Compl. ¶ 58.  In yet another instance, on May 7, 2009, approximately 60,095 calls were made between 2:00 p.m. and 3:00 p.m. alone with a caller ID of

---

[2] On or about May 14, 2009, the Federal Trade Commission commenced an action, captioned *Federal Trade Commission v. Voice Touch, Inc.*, a Florida Corporation, doing business as Voice Tough; Network Foundations, LLC, a Delaware Corporation; James A. Dunne; Maureen E. Dunne; and Damian Kohlfeld; Civil Action No. 09-cv-2929, in the United States District Court for the Northern District of Illinois, Eastern Division, alleging, among other things, that Voice Touch violated the TCPA and TCFAPA.

(989) 637-1044, or on average one call every approximately .06 seconds. *See* First Amended Ver. Compl. ¶ 70.

**E.**   **The Harm To Verizon Wireless**

These Telemarketing Calls not only invade the privacy of Verizon Wireless' customers and employees, they also damage Verizon Wireless's relationships with its customers and impose customer service costs on Verizon Wireless.  Verizon Wireless customers who have received Telemarketing Calls may blame Verizon Wireless for the annoyance and intrusion they have suffered as a result of receiving these calls.  These customers will often call Verizon Wireless Customer Service to complain about the calls and to request credits for the airtime used by these calls, thus causing Verizon Wireless to incur significant additional costs as a result of these calls.  *See* First Amended Ver. Compl. ¶ 83.  In addition, because Verizon Wireless customers may blame Verizon Wireless for the intrusion of the Telemarketing Calls, the Telemarketing Calls damage Verizon Wireless's reputation and cause Verizon Wireless to lose goodwill.  This damage to Verizon Wireless's reputation and loss of goodwill are irreparable injuries to Verizon Wireless.

**F.**   **The Harm To OnStar**

OnStar has received numerous complaints from its customers that they have received unwanted calls on their OnStar wireless systems from various solicitors, including from the Advertiser Defendants named herein.  OnStar customers also complained that when the unwanted call was answered, a computerized sales message was received. *See* Ver. Compl. ¶ 84.

In addition, because of the unique nature of the OnStar system, when calls are made to an OnStar customer's wireless device, OnStar must answer the call even if the customer is not in the vehicle and the vehicle is not in use.  Since these calls result in a connected call, OnStar is billed

for each such call that it is required to answer.  Based on a review of its billing records, OnStar has received literally hundreds of thousands of calls from the telephone numbers identified herein. Indeed, OnStar records confirm that between January 1, 2009 and April 30, 2009, OnStar subscribers have received over 400,000 calls from the telephone numbers identified herein. *See* First Amended Ver. Compl. ¶ 85.

In addition, given the frequent change in telephone numbers utilized by the Caller Defendants, OnStar subscribers have received hundreds of thousands of additional calls that were made and/or facilitated by the Defendants using other numbers not identified in the complaint.  In this regard, OnStar records show that over one million unwanted calls from various telephone numbers have been received since January 1, 2009. *See* First Amended Ver. Compl. ¶ 86.

Based on the volume of calls placed from a single telephone number during very short time spans, OnStar believes that the calls were made by using automatic telephone dialing system equipment.  For instance, during a single day, approximately 42,732 calls were made from caller ID 909-650-09173, thus demonstrating that the calls were not being manually made. *See* First Amended Ver. Compl. ¶ 87.

As a result of these unwanted and unsolicited calls, OnStar has been significantly damaged in that (1) it has had to pay for calls that it is required to answer because of its unique operating system; (2) it has received numerous customer complaints and has been required to refund the cost of calls to its customers, and (3) the calls impose on OnStar customer service costs and interfere with its relationship with its customers.  OnStar's actual damages to date greatly exceed $75,000, and are accruing on an on-going basis.

## ARGUMENT

## THE COURT SHOULD ENTER THE PROPOSED ORDER
## TO SHOW CAUSE AND A PRELIMINARY INJUNCTION

The TCPA specifically provides that an aggrieved parties such as Plaintiffs may institute

a private right of action seeking, among other relief, an injunction. It states, in relevant part, that

"[a] person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in

an appropriate court of that State . . . an action based on a violation of this subsection or the

regulations prescribed under this subsection to enjoin such violation." 47 U.S.C. § 227 (b)(3).[3]

The TCFAPA similarly provides that "an action may be brought to enjoin such telemarketing"

that is done in violation of the statute. *See* 15 U.S.C. § 6104(a).

### A.   Plaintiffs Are Entitled to an Injunction Pursuant to Statutory Authority

When preliminary injunctive relief is sought pursuant to statutory authority, the movant

must establish (1) a violation of the statute sued upon; and (2) a reasonable likelihood of future

violations of the statute in the absence of injunctive relief. *U.S. v. Toys "R" Us, Inc.*, 754 F.

Supp. 1050, 1053 (D.N.J. 1991); *see In re Bradshaw,* 233 B.R. 315, 326 (D.N.J. 1999). No

showing of irreparable harm is necessary in an action for a preliminary statutory injunction. *In

re Bradshaw,* 233 B.R. at 326; *Government of V.I. v. Virgin Islands Paving, Inc.,* 714 F.2d 283,

286 (3d Cir. 1983); *United States v. Spectro Foods Corp.,* 544 F.2d 1175, 1181 (3d Cir. 1976);

*United States Postal Service v. Beamish*, 466 F.2d 804, 806 (3d Cir. 1972). The traditional test is

---

[3]   Although the TCPA does not provide federal question jurisdiction for claims brought pursuant to the statute, this Court nevertheless has federal question jurisdiction over the TCFAPA claims pursuant to 15 U.S.C. § 6104(a) and supplemental jurisdiction over the TCPA as well as the other claims asserted. 28 U.S.C. § 1367. 28 U.S.C. § 1367; *cf. Gottlieb v. Carnival Corp.*, 436 F.3d 335, 343 (2d Cir. 2006) (federal court has diversity jurisdiction over TCPA claims).

not applied because where "Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action." *In re Bradshaw*, 233 B.R. at 326 (citing *United States v. Richlyn Laboratories, Inc.*, 827 F. Supp. 1145, 1150 (E.D. Pa. 1992)). Moreover, an examination of whether a preliminary injunction pursuant to a statute is in the public interest is unnecessary because Congress acts in the public's interest. *In re Bradshaw*, 233 B.R. at 326; *see Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803 (3d Cir. 1989).

"A determination of whether there is reasonable likelihood of future violations is based upon the totality of the circumstances." *In re Bradshaw*, 233 B.R. at 329; *Toys "R" Us, Inc.*, 754 F. Supp. at 1059. Past misconduct is "highly suggestive of the likelihood of future violations." *In re Bradshaw*, 233 B.R. at 329 (quoting *SEC v. Management Dynamics*, 515 F.2d 801, 807 (2d Cir. 1975)). Indeed, when the misconduct "has been founded on systematic wrongdoing rather than an isolated occurrence, a court should be more willing to enjoin" the defendant from engaging in the wrongful conduct. *Id.* (quoting *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

1. **The Caller Defendants, Advertiser Defendants and Facilitator Defendants Clearly Have Violated the TCPA**

The TCPA, 47 U.S.C. § 227, *et seq.*, was enacted to, among other things, protect the privacy interests of wireless telephone users from the use of automated dialing equipment or prerecorded voices to make unsolicited telemarketing calls to cellular telephones. The TCPA provides, in relevant part, that "[i]t shall be unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system <u>or</u> an artificial or

prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone." 47 U.S.C. § 227(b)(1)(emphasis added).

The TCPA specifically provides that an aggrieved party may institute a private right of action. It states, in relevant part, that "[a] person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State . . . an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation, . . . [and/or] to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3); *Kaplan v. Democrat and Chronicle*, 698 N.Y.S.2d 799, 800 (N.Y. App. Div. 1999).

The Caller Defendants and Advertiser Defendants have violated the TCPA, in that they have, within the United States, made calls to telephone numbers assigned to cellular telephones, not for emergency purposes and not made with the prior express consent of the called party, using (1) an artificial or a prerecorded voice and/or (2) an automatic telephone dialing system, and/or they have participated in and facilitated in the making of such calls, and have benefitted from such calls having been made. *See Schulman v. Chase Manhattan Bank*, 268 A.D.2d 174, 175-176 (N.Y. App. Div. 2000); *see also Szefczek v. Hillsborough Beacon*, 286 N.J. Super. 247, 266-68 (Law Div. 1995) (issuing a permanent injunction for TCPA violations).

As shown earlier, it is beyond dispute that the Caller Defendants and Advertiser Defendants are responsible for the calls that Verizon Wireless customers and concession lines are receiving that are marketing auto warranties and that these calls involve prerecorded voice messages. This has been attested to by customers and employees who have received in some cases multiple calls with automated voice announcements that resulted in their being directed to the Advertiser Defendants, and by the fact that requests for information concerning the products

offered through the Telemarketing Calls directed customers and employees to telephone numbers associated with, and the physical location of, the Advertiser Defendants.

Moreover, it is also plain that these calls are being generated by an automatic telephone dialing system. The term "automatic telephone dialing system" means equipment which has the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator; and . . . to dial such numbers." 47 U.S.C. § 227(a)(1). For example, Verizon Wireless data indicate that approximately 25,911 calls were made on March 13, 2009 with a caller ID of 949-256-9145 to Verizon Wireless's customers and/or concession accounts from 1:00 p.m. and 2:00 p.m., or on average one call every approximately .13 seconds. The volume of calls placed from a single telephone number during very short time spans demonstrates that they were made by using automatic telephone dialing system equipment that has the capacity to store or produce telephone numbers to be called using a random or sequential number generator. There is simply no physical way that so many calls could be made by a human being dialing phone numbers without an automated dialing system.

### 2. The Caller Defendants, Advertiser Defendants and Facilitator Defendants Clearly Have Violated the TCFAPA

The Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. § 6101, *et seq.*, authorized the Federal Trade Commission to prescribe rules to prevent deceptive and abusive telemarketing practices. Among the practices deemed abusive by the FTC in its rules promulgated pursuant to the TCFAPA is a telemarketer's "[f]ailing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call. . . ." 16 C.F.R. § 310.4(a)(7). Under the rules promulgated pursuant to the TCFAPA, it is also an abusive telemarketing act or practice "for a telemarketer in an outbound

17

telephone call . . . to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information: (1) the identity of the seller . . . ." 16 C.F.R. § 310.4(d).

The Caller Defendants and Advertiser Defendants have violated the TCFAPA and associated FTC regulations by preventing the name of the telemarketer from appearing on customers' caller IDs when the customers receive Telemarketing Calls. Additionally, the Caller Defendants Advertiser Defendants and Facilitator Defendants attempt to hide rather than disclose the identity of the company making these calls by refusing to disclose to customers the company offering the warranty at the outset of the call (if at all).

Under the rules promulgated under the TCFAPA, it is also an abusive practice "for a person to provide substantial assistance or support to any seller or telemarketer when that person learns or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates § 310(a), (c) or (d) or § 310.4 of this Rule." 16 C.F.R. § 310.3(b). As set forth above, 16 C.F.R. § 310.4(a)(7) prohibits telemarketers from "[f]ailing to transmit or cause to be transmitted the telephone number" and/or "the name of the telemarketer." The Facilitator Defendants have violated the TCFAPA and associated FTC regulations by obtaining hundreds of telephone numbers from telecommunications service providers and providing such numbers to the Caller Defendants and/or the Advertiser Defendants to appear on customers' caller IDs when the Verizon Wireless employees and customers receive Telemarketing Calls. The Facilitator Defendants are well aware that the Caller Defendants use this multiplicity of numbers to enable them to hide their identity when making Telemarketing Calls. Indeed, it is hard to imagine any legitimate business purpose for which any of the Caller Defendants would require the purchase of such a large quantity of caller IDs. Moreover, the illegal purposes for which the Caller

18

Defendants use these numbers has been made plain to the Facilitator Defendants by the numerous complaints that have been brought to their attention regarding use of these numbers, as well as the specific requests from Verizon Wireless -- both informal as well as by subpoena -- for information and assistance to stop the illegal telemarketing campaign that the Caller Defendants have been propagating through the use of these caller IDs.  The Facilitator Defendants have refused to cooperate with these requests, have ignored these subpoenas, and have instead continued to supply these large number of caller IDs to the Caller Defendants.

This "substantial assistance or support" the Facilitator Defendants have provided to the Caller Defendants and Advertiser Defendants has allowed the Caller Defendants and Advertiser Defendants to fail to transmit their names and/or the telephone numbers from which they calls they have placed or have been placed on their behalf in violation of 16 C.F.R. § 310.4.  Because the Facilitator Defendants knew of or consciously avoided knowing that the Caller Defendants and/or the Advertiser Defendants to whom they provided telephone numbers were engaged in an act or practice that violates 16 C.F.R. §§ 310.3(a), (c) or (d) or § 310.4, the Facilitator Defendants violated the TCFAPA.

### 3.    Reasonable Likelihood of Future Violations

The Caller Defendants, Advertiser Defendants and Facilitator Defendants' misconduct is "highly suggestive" of future violations.  Just the sheer volume of Telemarketing Calls alone -- more than 8,091,335 in just over four months -- indicates that Caller Defendants, Advertiser Defendants and Facilitator Defendants will continue to make or facilitate such calls in the future. The ease with which, and the minimal time in which, the Caller Defendants and Advertiser Defendants can make such calls through the use of an automatic telephone dialing system evidences that, without a preliminary injunction, it is reasonably likely that the Caller Defendants, Advertiser Defendants and Facilitator Defendants will continue to make

Telemarketing Calls with minimal effort in violation of the TCPA.  Moreover, where the past misconduct is systematic, as it is here, courts are more willing to enjoin defendants from such wrongful conduct. *See, e.g., In re Bradshaw*, 233 B.R. at 329.

*     *     *

Thus, Plaintiffs have established that the Caller Defendants, Advertiser Defendants and Facilitator Defendants violated the TCPA and TCFAPA and are reasonably likely to continue violating these statutes.  Accordingly, a preliminary injunction is warranted and should be issued.

**B.**    **Plaintiffs Are Also Entitled to an Injunction Pursuant to Federal Rule of Civil Procedure 65**

Federal Rule of Civil Procedure 65, under which the Court is empowered to issue interim relief pending final disposition of a matter, provides an alternate source of authority under which the preliminary injunction should be issued. *See Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100 (3d Cir. 1988).   In deciding whether to grant such preliminary injunctive relief, courts consider four basic principles:  (1) the likelihood that the moving party will succeed on the merits; (2)  the extent to which the moving party will suffer irreparable harm without injunctive relief; (3)  the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586 (3d Cir. 2002); *Frank's GMC*, 847 F.2d at 102.

Although the statutory basis for an injunction exists for Verizon Plaintiffs' TCPA claim, under the Rule 65 analysis, a preliminary injunction is warranted as well.  Indeed, as summarized below, Plaintiffs handily satisfy each of these elements on its claims against the Caller Defendants, Advertiser Defendants and Facilitator Defendants under not only the TCPA, but under the New Jersey Consumer Fraud Act and for invasion of privacy.  The Court should enter

the proposed Order to Show Cause and set a return date for a hearing on a preliminary injunction, which should be granted.

### 1.   Likelihood of Success on the Merits

As summarized below, Plaintiffs have demonstrated an overwhelming probability that they will prevail on its claims against the Caller Defendants, Advertiser Defendants and Facilitator Defendants under the TCPA, TCFAPA, the New Jersey Consumer Fraud Act and for invasion of privacy.

### a.   TCPA

As previously explained, *supra* Part A.1., the Caller Defendants, Advertiser Defendants and Facilitator have violated the TCPA, in that they have, within the United States, made calls to telephone numbers assigned to cellular telephones, not for emergency purposes and not made with the prior express consent of the called party, using (1) an automatic telephone dialing system and/or (2) an artificial or a prerecorded voice. *See Schulman v. Chase Manhattan Bank,* 268 A.D.2d 174, 175-176 (N.Y. App. Div. 2000); *see also Szefczek v. Hillsborough Beacon,* 286 N.J. Super. 247, 266-68 (Law Div. 1995) (issuing a permanent injunction for TCPA violations). Over eight million Telemarketing Calls were made to Verizon Wireless's customers and/or concession accounts since February 23, 2009.   Such volume during a short time span demonstrates that the Telemarketing Calls were made by using automatic telephone dialing system equipment that has the capacity to store or produce telephone numbers to be called using a random or sequential number generator.   Thus, it is more than likely that Plaintiffs will succeed on the merits of their claim under the TCPA.

### b.   Violation of TCFAPA

As previously explained, *supra* Part A.2, the Caller Defendants, Advertiser Defendants and Facilitator Defendants have violated the TCFAPA, in that they have engaged in practices

deemed abusive by the FTC in its rules promulgated pursuant to the TCFAPA, by engaging in telemarketing and "[f]ailing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call. . . ." 16 C.F.R. § 310.4(a)(7). The Caller Defendants, Advertiser Defendants and Facilitator Defendants have also violated the TCFAPA by "in an outbound telephone call . . . to induce the purchase of good or services . . . fail[ing] to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call . . . the identity of the seller." 16 C.F.R. § 310.4(d).

The Caller Defendants, Advertiser Defendants and Facilitator Defendants have violated the TCFAPA and associated FTC regulations by preventing the phone number and name of the telemarketer from appearing on customer's caller ID when they receive Telemarketing Calls. The TCFAPA permits any person "adversely affected by any pattern or practice of telemarketing which violates any rule of the Commission" to bring an action for damages and/or to enjoin such conduct if the amount in controversy "exceeds the sum or value of $50,000 in actual damages." *See* 15 U.S.C. § 6104(a). Both Verizon Wireless and OnStar have suffered in excess of $50,000 in actual damages as a result of the Caller Defendants, Advertiser Defendants and Facilitator Defendants making and/or facilitating over one million illegal Telemarketing Calls to Verizon Wireless customers and employees, and thus, it is likely to prevail on its claim under the TCFAPA.

### c.   NJ CFA

N.J.S.A. 56:8-130(a) prohibits telemarketers from making or causing to be made any telemarketing sales call to a commercial mobile service device of any customer. N.J.S.A. 56:8-130(b) defines a "commercial mobile service device" to be "any equipment used for the purpose

of providing commercial mobile service," including Verizon Wireless's customers' and employees' wireless phones.

The Caller Defendants, Advertiser Defendants and Facilitator Defendants have violated the Consumer Fraud Act, in that they, acting as telemarketers, have made, caused to be made, or facilitated the making of telemarketing sales calls to customers' commercial mobile service devices.  The Caller Defendants, Advertiser Defendants and Facilitator Defendants' conduct of making unsolicited telemarketing calls to Verizon Wireless subscribers on their wireless phones, including calls made to employee concession accounts, violates N.J.S.A. 56:8-130.

As a result of the Caller Defendants, Advertiser Defendants and Facilitator Defendants' violations of the New Jersey Consumer Fraud Act, Verizon Wireless has suffered injury, damages and an ascertainable loss of money.

### d.    Invasion of Privacy

One is subject to liability for the tort of invasion of privacy if one intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, if the intrusion would be highly offensive to a reasonable person.  *Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 94-95 (1992); *Kinsella v. Welch*, 362 N.J. Super. 143, 156 (App. Div. 2003) (citing *Restatement (Second) of Torts* § 652B (1977)).

In engaging in the foregoing conduct, the Caller Defendants, Advertiser Defendants and Facilitator Defendants have intruded intentionally upon the solitude or seclusion of the recipients of the Telemarketing Calls, and/or upon their private affairs or concerns.  Such intrusion is, objectively, highly unreasonable and such conduct harms Verizon Wireless and its customers. As a result, the Caller Defendants, Advertiser Defendants and Facilitator Defendants are liable for the invasion of privacy.  *See Hennessey*, 129 N.J. at 94-95; *Kinsella*, 362 N.J. Super. at 156.

*        *        *

Thus, Verizon Wireless has established the requisite likelihood of success on the merits of its claims against the Caller Defendants, Advertiser Defendants and Facilitator Defendants.

### 2.    Irreparable Injury

The Caller Defendants, Advertiser Defendants and Facilitator Defendants' conduct threatens Plaintiffs with irreparable injury because their actions place in substantial jeopardy the hard-earned relationships that Verizon Wireless and OnStar have forged and established with their more than customers.  Plaintiffs' customers may blame Plaintiffs, and it is plain that if the Caller Defendants, Advertiser Defendants and Facilitator Defendants' conduct is permitted to continue, Plaintiffs' relationships with its customers will be further endangered.

Moreover, and as previously explained, the Caller Defendants, Advertiser Defendants and Facilitator Defendants' conduct invades the privacy of Verizon Wireless's customers, who are the recipients of illegal and unwanted telemarketing on their wireless telephone lines.  Such customers, who may be damaged and harmed, may not have the ability or capacity to identify and pursue the Caller Defendants, Advertiser Defendants and Facilitator Defendants for such misconduct, and thus, they will have suffered a wrong without a possible remedy.

It is well settled that "loss of control of reputation, loss of trade, and loss of good will" constitute irreparable injury.  *See, e.g., Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).  Indeed, a threatened loss of customers such as Plaintiffs face as a result of the Caller Defendants, Advertiser Defendants and Facilitator Defendants' actions here, is precisely the circumstance in which interlocutory injunctive relief is necessary, because "one cannot quantify the amount of damages which will result" from a potential loss in customers. *See, e.g., Sunbeam Corp. v. Windsor 5th Avenue,* 14 N.J. 222, 233 (1953).  As explained by the New Jersey Supreme Court:

24

> The object of a preliminary injunction is to prevent some threatening, irreparable mischief which should be averted pending a full and deliberate investigation of the case, and acts which destroy a complainant's business, custom and profits are in this category and authorize the issue of a preliminary injunction.

*Sunbeam*, 14 N.J. at 233 (citing *Evening Times Printing & Publishing Co. v. American Newspaper Guild*, 124 N.J. Eq. 71, 74 (E. & A. 1938)).

The principle that preliminary injunctive relief must be entered to protect hard-earned customer relationships was aptly explained by the Chancery Court in *J.H. Renarde, Inc. v. Sims*, 312 N.J.Super. 195, 203 (Ch. Div. 1998):

> any attempt to quantify such damages would be problematic, not only in determining whether a particular customer who may be served by defendants is one which would have gone to plaintiff's business (but for the unlawful competition) but also because of the difficulty in ascertaining the monetary value of that loss of business. Under those circumstances, this factor should be viewed as supporting the issuance of the injunction.

312 N. J. Super. at 203 (citing *National Starch & Chemical Corp. v. Parker Chemical Corp.*, 219 N.J. Super. 158, 163 (App.Div. 1987)).  Thus, Verizon Wireless has demonstrated that it will suffer irreparable harm absent the requested relief.

### 3.    Balance of Harms and the Public Interest

As demonstrated above, Plaintiffs and their customers are threatened with harm if the Caller Defendants, Advertiser Defendants and Facilitator Defendants are permitted to continue their conduct, while Defendants cannot complain if they are required to cease the fraudulent conduct.  The balance of harms is decidedly in favor of the injunctive relief sought, which also will benefit the public and Verizon Wireless's more than 80 million customers, who have the right to be protected from the Caller Defendants, Advertiser Defendants and Facilitator Defendants' invasion of privacy.  The requested relief would benefit the public interest.  *See Renarde, supra*, 312 N. J. Super. at 206.

It is hard to imagine any legitimate harm the Caller Defendants, Advertiser Defendants or Facilitator Defendants would suffer if the requested relief is granted, as a defendant who knowingly infringes another's rights "cannot complain of harm that will befall it when properly forced to desist from its infringing activities." *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995), *cert. denied*, 516 U.S. 1145 (1996).

Any harm to the Caller Defendants, Advertiser Defendants and Facilitator Defendants from ceasing the wrongful conduct should not be legally cognizable and, in any event, is minimal compared to the diminution of the substantial value and goodwill inherent in Plaintiffs' customer relations. Nothing precludes the Caller Defendants, Advertiser Defendants and Facilitator Defendants from providing services that do not infringe upon Verizon Wireless's and its customers' rights, and preventing Defendants from continuing their illicit activities cannot be a compelling hardship. Accordingly, the balance of hardships weighs strongly in Plaintiffs' favor.

## C.   **Expedited Discovery**

Finally, the Court should allow expedited discovery in advance of the return date for the preliminary injunction. *See, e.g., TKR Cable* Co. *v. Cable City Corp.*, 1996 WL 465508 (D.N.J. 1996) (granting preliminary injunction and affirming grant of expedited discovery), *vacating on other grounds but affirming injunction*, 267 F.3d 196 (3d Cir. 2001). Litigation, including disputes involving public matters such as this case, which involves important issues concerning customer privacy, should be expedited. *Jersey City Ass'n for Separation of Church and State v. Jersey City*, 34 N.J. 177, 178 (1961). A trial court may on application of either party fix a short date for completion of discovery and an early peremptory date thereafter for final trial. *Id.; see also TKR Cable Co.*, 1996 WL465508 at *12 (granting preliminary injunction and affirming grant of expedited discovery). The circumstances here warrant expedited discovery.

## CONCLUSION

For the foregoing reasons, Plaintiffs' application should be granted in its entirety. The Court should enter the proposed Order to Show Cause and on the return date, enter a preliminary injunction. The Court also should permit expedited discovery in advance of the return date.

Respectfully submitted,
GREENBERG TRAURIG, LLP


By: /s/ Ian S. Marx
     Philip R. Sellinger
     Ian S. Marx

200 Park Avenue
P.O. Box 677
Florham Park, New Jersey  07932-0677
(973) 360-7900 (Phone)
(973) 301-8410 (Facsimile)
Attorneys for Cellco Partnership
d/b/a Verizon Wireless

-and-
McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
By:
     Stephen F. Payerle

Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711 (Phone)

Timothy A. Daniels
FIGARI & DAVENPORT, LLP
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 752-2
(214) 939-2016 (Phone)

Dated:  June 15, 2009